**C.A. No. 26-6445**

# In the United States Court of Appeals for the Ninth Circuit

**ROGER ROGOFF,**

***Plaintiff-Appellee,***

v.

**DONALD J. TRUMP, ET AL.,**

***Defendants-Appellants.***

*On Appeal from the United States District Court for the Western District of Washington*
*Case No. 2:26-cv-02566-SAB*
*The Honorable Stanley A. Bastian*

## PLAINTIFF-APPELLEE'S ANSWERING BRIEF

Hailyn J. Chen
Victoria A. Degtyareva
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Shannon Aminirad
Connor Hoge
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Donald B. Verrilli Jr.
Esthena L. Barlow
Cynthia Y. Long
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION....................................................................4

ISSUE PRESENTED ....................................................................................4

STATEMENT OF THE CASE.........................................................................4

A. A Vacancy Arises in the Office of U.S. Attorney for the Western District of Washington. ..........................................4

B. The Court Appoints Roger Rogoff.......................................................5

C. Defendants Purport to Fire Rogoff, as They Have Fired Other § 546(d) Appointees. .........................................................6

D. Proceedings Below. ...........................................................................9

SUMMARY OF THE ARGUMENT ................................................................12

STANDARD OF REVIEW ..............................................................................16

ARGUMENT .................................................................................................17

I. Rogoff Is Likely to Succeed on the Merits..............................................17

A. Section 546(d) Precludes Rogoff's Firing..........................................17

1. Section 546(d) Is Carefully Designed to Reinforce the Appointments Clause. .....................................................17

2. Rogoff's Dismissal Violates the Statutory Framework Governing the Service of Interim U.S. Attorneys. ...................21

3. Defendants' Counterarguments Lack Merit. ............................26

B. Rogoff's Firing Violates the Appointments Clause and Is Not Justified by Article II.........................................................................35

1. Rogoff's Firing Would Violate the Appointments Clause. ......35

2. Restricting the Executive's Ability to Fire Interim U.S. Attorneys Does Not Intrude on Presidential Prerogatives........40

II. The District Court Did Not Abuse Its Discretion in Entering a Preliminary Injunction........52

A. Absent Relief, Rogoff Will Suffer Irreparable Harm........52

B. The Equities and Public Interest Strongly Favor Relief........54

1. The Public Has an Interest in Preserving the Separation of Powers and in the Administration of Justice........55

2. Defendants Will Not Suffer Harm as a Result of the Injunction........57

CONCLUSION........59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ....................16

*Aviel v. Gor*,
780 F. Supp. 3d 1 (D.D.C. 2025) ....................53

*Bennett v. Isagenix Int'l, Inc. LLC*,
118 F.4th 1120 (9th Cir. 2024) ....................58

*Berry v. Reagan*,
1983 WL 538 (D.D.C. Nov. 14, 1983) ....................52, 53

*Blake v. United States*,
103 U.S. 227 (1880) ....................47

*Blanche v. Perlmutter*,
146 S. Ct. 2812 (2026) ....................46

*Bowsher v. Synar*,
478 U.S. 714 (1986) ....................50

*Brown v. Gardner*,
513 U.S. 115 (1994) ....................28

*Carcieri v. Salazar*,
555 U.S. 379 (2009) ....................22

*Carlucci v. Doe*,
488 U.S. 93 (1988) ....................32

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025) ....................52, 53, 57

*Dolan v. USPS*,
546 U.S. 481 (2006) ....................27

*Dubin v. United States*,
599 U.S. 110 (2023) ....................26

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ........................................................................54

*Edmond v. United States*,
520 U.S. 651 (1997)..........................................................................1, 39

*In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*,
2026 WL 686046 (N.D.N.Y. Mar. 11, 2026) ......................................................55

*In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*,
814 F. Supp. 3d 284 (N.D.N.Y. 2026)..........................................................7, 8, 9

*In re Hennen*,
38 U.S. (13 Pet.) 230 (1839)..........................................................32, 40

*Home Depot USA, Inc. v. Jackson*,
587 U.S. 435 (2019).........................................................................22

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550 (9th Cir.
2016) ...................................................................................24

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025).........................................................................37

*Keyes v. United States*,
109 U.S. 336 (1883).........................................................................47

*King v. Burwell*,
576 U.S. 473 (2015).........................................................................26

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026).........................................................................29

*Lucia v. SEC*,
585 U.S. 237 (2018).........................................................................39

*Mansell v. Mansell*,
490 U.S. 581 (1989).........................................................................26

*Mistretta v. United States*,
488 U.S. 361 (1989)..........................................................3, 46, 50, 51

*Myers v. United States*,
272 U.S. 52 (1926) .......... passim

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*,
23 F.3d 1508 (9th Cir. 1994) .......... 51

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) .......... 48

*NLRB v. SW Gen.*,
580 U.S. 288 (2017) .......... 17, 18, 38, 48

*Parsons v. United States*,
167 U.S. 324 (1897) .......... 29, 30

*Preminger v. Principi*,
422 F.3d 815 (9th Cir. 2005) .......... 54

*RadLax Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 34

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) .......... 57

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 52, 53

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 3, 45

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) .......... 54, 56, 58

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) .......... 57, 58

*Trump v. Cook*,
609 U.S. 528 (2026) .......... 57

*Trump v. Slaughter*,
609 U.S. 422 (2026) .......... 40, 45, 48

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025)....................57, 58

*United States v. Comey*,
810 F. Supp. 3d 768 (E.D. Va. 2025)....................8, 9

*United States v. Evans-Martinez*,
611 F.3d 635 (9th Cir. 2010)....................31

*United States v. Gantt*,
194 F.3d 987 (9th Cir. 1999)....................passim

*United States v. Giraud*,
160 F.4th 390 (3d Cir. 2025)....................7, 8

*United States v. Hilario*,
218 F.3d 19 (1st Cir. 2000)....................31

*United States v. Jackson*,
187 F.4th 1198 (9th Cir. 2026)....................passim

*United States v. Jackson*,
No. 26-304 (filed Sept. 8, 2026)....................43

*United States v. James*,
810 F. Supp. 3d 752 (E.D. Va. 2025)....................8, 9

*United States v. Martinez*,
565 F. Supp. 2d 1270 (D.N.M. 2008)....................31

*United States v. Naviwala*,
825 F. Supp. 3d 451 (D.N.J. 2026)....................8, 9, 31, 56

*United States v. Paulson*,
68 F.4th 528 (9th Cir. 2023)....................28

*United States v. Ramirez*,
807 F. Supp. 3d 1086 (C.D. Cal. 2025)....................8

*United States v. Ramirez-Martinez*,
2026 WL 113431 (D.N.M. Jan. 14, 2026)....................8

*United States v. Solomon*,
216 F. Supp. 835 (S.D.N.Y. 1963) ....................................................................31

*United States v. Woodley*,
751 F.2d 1008 (9th Cir. 1985) ........................................................................35

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
959 F.3d 1201 (9th Cir. 2020) ........................................................................27

*Weiss v. United States*,
510 U.S. 163 (1994) ......................................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ......................................................................................50

**FEDERAL STATUTES**

5 U.S.C. § 3345 ....................................................................................passim

5 U.S.C. § 3346 ............................................................................1, 19, 47

5 U.S.C. § 3349a ...........................................................................19, 47

5 U.S.C. § 7513 ........................................................................................47

28 U.S.C. § 515 ........................................................................................41

28 U.S.C. § 541 ..................................................................6, 10, 20, 26

28 U.S.C. § 546 ....................................................................................passim

28 U.S.C. § 547 ............................................................................6, 28, 52

Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768 ...........................................20

Pub. L. No. 109-177, § 502, 120 Stat. 192 (2006) .....................................21

Pub. L. No. 110-34, § 2, 121 Stat. 224 (2007) ..........................................21

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article II, § 2, cl. 2 .............................................................passim

**LEGISLATIVE MATERIALS**

153 Cong. Rec. S1993 (2007).....21

153 Cong. Rec. S1994 (2007).....23

**OTHER AUTHORITIES**

The Federalist No. 76 (C. Rossiter ed., 1961).....17, 38

U.S. Att'y's Off., W.D. Wash., About the District, https://www.justice.gov/usao-wdwa (last visited Oct. 16, 2026).....12

## INTRODUCTION

The Appointments Clause "is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). It gives the President a central role in naming officers of the United States and recognizes the President's need for sufficient control over those who execute the laws. But it also imposes a check on the President's power by giving the Senate its own power to give—or withhold—consent to the President's chosen nominees, thus guarding against the consolidation of power in any branch and the threat to individual liberty that comes with it. And for inferior officers, including U.S. Attorneys, the Appointments Clause also authorizes Congress to "vest" the appointment of such officers, "as they think proper," in the President alone, in the courts, or in department heads. U.S. Const. art. II, § 2, cl. 2.

Congress has exercised its Appointments Clause authority to craft a statutory framework for temporarily filling vacant U.S. Attorney positions that is designed to reinforce the constitutional division of authority in the Appointments Clause itself. That framework, which includes 28 U.S.C. § 546 and the Federal Vacancies Reform Act ("FVRA"), gives the President multiple ways to fill U.S. Attorney vacancies temporarily, without the Senate's involvement, for a period sufficient to allow the President to nominate and the Senate to confirm a permanent U.S. Attorney. *See* 28 U.S.C. § 546(a), (c); 5 U.S.C. §§ 3345, 3346. When those time

periods have expired and the President has still failed to obtain Senate confirmation, however, the power to make interim appointments shifts to the district court, where it remains "until the vacancy is filled" by a Senate-confirmed U.S. Attorney. 28 U.S.C. § 546(d). That framework provides the Executive with ample flexibility while also preventing the Executive from indefinitely evading the Senate's constitutional power to approve appointments—thereby incentivizing the President to identify a nominee whom the Senate will confirm.

Here, long after the options for making interim appointments under § 546 and the FVRA had been exhausted, and with no nomination pending to fill the vacant position, the district court exercised the authority that Congress conferred on it in § 546(d) to appoint Roger Rogoff as U.S. Attorney for the Western District of Washington. Within hours, the President purported to fire Rogoff, without anyone confirmed by the Senate to replace him.

The President's firing of Rogoff contravenes § 546(d), which makes clear that a court-appointed U.S. Attorney serves until the President appoints a replacement with the Senate's consent. It also violates the Constitution. Permitting at-will firing of court-appointed U.S. Attorneys upends the careful balance that Congress created, nullifies Congress's choice to vest interim appointment power in the courts after a period of time, and risks erasing the Senate from U.S. Attorney appointments altogether.

Defendants' arguments to the contrary boil down to the contention that Article II invariably outlaws even the most minor inconvenience to the President's exercise of his constitutional powers, even to preserve the textually bestowed constitutional authority of a coordinate Branch. No precedent from this Court or the Supreme Court supports that extraordinary proposition. To the contrary, § 546(d) falls squarely within Congress's authority to "provide tenure protections to certain inferior officers," *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (emphasis omitted), where the President remains responsible for the exercise of executive power (here, via the Attorney General's plenary authority over all U.S. Attorney's offices). And it reflects the exact sort of "carefully crafted system of checked and balanced power" that the Supreme Court has repeatedly endorsed. *Mistretta v. United States*, 488 U.S. 361, 381 (1989). There is no basis for this Court to depart from that well-established precedent.

It is important to understand what is really going on here. Rogoff's removal is part and parcel of the President's effort to avoid Senate consideration of the persons he wants in charge of U.S. Attorney's offices so that he can install unqualified political allies willing to carry out unjustified political retribution against his perceived foes—precisely the evil that the Framers included the Appointments Clause to prevent. Before Rogoff challenged his firing, the President (who is almost halfway through his term) had not even nominated

anyone to fill the vacant U.S. Attorney's office in the Western District of Washington or in numerous other districts—and had fired a number of interim U.S. Attorneys lawfully appointed by courts, leaving many U.S. Attorney's offices in the hands of people the Senate has had no opportunity to evaluate. Defendants have not remotely justified this end-run around the Appointments Clause and the constitutional values it exists to protect. The district court certainly did not abuse its discretion in entering a preliminary injunction invalidating Rogoff's unlawful removal. This Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiff-Appellee agrees with Defendants-Appellants' statement of jurisdiction.

## ISSUE PRESENTED

Whether the district court abused its discretion by granting Rogoff's motion for a preliminary injunction on the grounds that his purported firing was likely unlawful, he would suffer irreparable harm, and the equities favored an injunction.

## STATEMENT OF THE CASE

### A. A Vacancy Arises in the Office of U.S. Attorney for the Western District of Washington.

The last Senate-confirmed U.S. Attorney in the Western District of Washington resigned in June 2023. ER-22. At that point, Tessa Gorman, then the First Assistant U.S. Attorney, became Acting U.S. Attorney pursuant to the FVRA.

ER-22. After the FVRA's time limit expired, then-Attorney General Merrick Garland appointed Gorman as interim U.S. Attorney pursuant to § 546(a), and she was subsequently appointed by the Court pursuant to § 546(d). ER-22-23. President Trump then purported to fire Gorman, after which Teal Luthy Miller (who was First Assistant U.S. Attorney) assumed the title of Acting U.S. Attorney pursuant to the FVRA. ER-23. In October 2025, then-Attorney General Pamela Bondi purported to appoint Charles Neil Floyd as interim U.S. Attorney pursuant to § 546(a). SER-90. On the day that § 546(c)(2)'s 120-day period expired, in February 2026, Bondi designated Floyd "First Assistant U.S. Attorney" for the district. SER-96.

### B. The Court Appoints Roger Rogoff.

On January 14, 2026, the Court issued an order stating that, "in the event the President does not appoint, with the advice and consent of the Senate, a United States Attorney for the Western District of Washington before February 3, 2026, the Court intends to appoint a United States Attorney under Section 546(d) to serve until the vacancy is filled." SER-163. The Court subsequently announced a merit selection panel to evaluate candidates. SER-166.

Rogoff submitted his name for consideration. SER-154 ¶ 10. Rogoff has practiced law for more than 30 years, including as a state prosecutor, Assistant

U.S. Attorney, judge, and director of the Washington Office of Independent Investigations. SER-153-154 ¶¶ 2–8.

On July 15, 2026, the Court appointed Rogoff as U.S. Attorney pursuant to § 546(d), and he was sworn in that same day. ER-23-24. The Court's appointment order stated: "Mr. Rogoff is authorized to serve as the United States Attorney for the Western District of Washington until the vacancy is filled by an officer appointed by the President with the advice and consent of the Senate in accordance with the United States Constitution, Article II, Section 2 and 28 U.S.C. § 541(a)." ER-24. As U.S. Attorney, Rogoff is charged by statute with "prosecut[ing] for all offenses against the United States" and "prosecut[ing] or defend[ing], for the Government," all civil actions or proceedings, among other responsibilities. 28 U.S.C. § 547.

### C. Defendants Purport to Fire Rogoff, as They Have Fired Other § 546(d) Appointees.

Less than an hour after he was sworn in, Rogoff was purportedly fired via an email from the Deputy Director of Presidential Personnel that stated: "the President of the United States has directed that I inform you that, pursuant to his authority under 28 U.S.C. 541(c) and Article II of the Constitution, you are hereby removed from the office of the United States Attorney for the Western District of Washington." ER-25.

Even before the Court appointed Rogoff, Defendants appeared committed to firing whomever the Court appointed. Shortly after the Court announced its appointment of a merit selection panel, then-Deputy Attorney General Todd Blanche posted on X: "These candidates do not have the support of POTUS, and I expect they will suffer the same fate as others have when judges ignore Article II." SER-150.

Blanche was referring to the Executive's firings of court-appointed U.S. Attorneys in other districts. For example, last year, Alina Habba was appointed by the Attorney General as interim U.S. Attorney for the District of New Jersey under § 546(a). *See United States v. Giraud*, 160 F.4th 390, 395 (3d Cir. 2025), *reh'g en banc denied*, No. 25-2635 (3d Cir. Jan. 26, 2026). When Habba was nearing the end of her 120-day term, the district court issued an order stating that, pursuant to § 546(d), Desiree Leigh Grace would be U.S. Attorney after the expiration of Habba's term, but Grace was promptly fired. *Id.*; SER-138, 141. The Attorney General sought to extend Habba's service as U.S. Attorney beyond 120 days through a series of maneuvers courts later determined to be unlawful, prompting Habba's resignation. *Giraud*, 160 F.4th at 395-96, 406-07; SER-98. Following months of turbulence caused by the lack of lawfully appointed leadership, the district court reached an "agreement" with the "administration" to appoint a new § 546(d) designee. SER-105. Similar scenarios played out in the Northern District

of New York and the Eastern District of Virginia, except those offices are currently led by *de facto* office heads who were not appointed by the district courts and never even nominated for consideration by the Senate. *See* SER-84-86 ¶¶ 14-18; SER-111-132; SER-143-148; *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*, 814 F. Supp. 3d 284, 288-89, 300-01 (N.D.N.Y. 2026), *aff'd*, 188 F.4th 595 (2d Cir. 2026), *petition for cert. filed*, No. 26-348 (U.S. Sept. 15, 2026); *United States v. James*, 810 F. Supp. 3d 752, 755-57, 768 (E.D. Va. 2025), *appeal filed*, No. 25-4673 (4th Cir. Dec. 22, 2025); *United States v. Comey*, 810 F. Supp. 3d 768, 772-74, 786-87 (E.D. Va. 2025), *appeal filed*, No. 25-4674 (4th Cir. Dec. 22, 2025).

In districts across the country, including several in this Circuit, the Executive's failure to abide by statutory limitations on the appointment of interim or acting U.S. Attorneys has led courts to disqualify the unlawfully appointed officials either from serving in that role or from participating in specified matters. *See United States v. Jackson*, 187 F.4th 1198, 1201-03 (9th Cir. 2026) (describing Defendants' "tactics to extend the service of other temporary appointees who have not been confirmed by the Senate" and disqualifying putative Acting U.S. Attorney for the District of Nevada), *aff'g United States v. Garcia*, 2025 WL 2784640, at *18 (D. Nev. Sept. 30, 2025), *petition for cert. filed*, No. 26-304 (U.S. Sept. 8, 2026); *Giraud*, 160 F.4th at 406-07; *Grand Jury Subpoenas*, 814 F. Supp. 3d at

300; *United States v. Ramirez*, 807 F. Supp. 3d 1086, 1114 (C.D. Cal. 2025); *United States v. Ramirez-Martinez*, 2026 WL 113431, at *23, *26 (D.N.M. Jan. 14, 2026); *United States v. Naviwala*, 825 F. Supp. 3d 451, 531 (D.N.J. 2026). Many of those districts remain without a lawfully appointed U.S. Attorney. *See* SER-84-87 ¶¶ 15, 21-23.

Other consequences have flowed from these maneuvers. Defense attorneys and courts have called into question the legality of criminal prosecutions and process, *e.g.*, *Jackson*, 187 F.4th at 1201 (disqualifying designated First Assistant from supervising criminal prosecutions); *Naviwala*, 825 F. Supp. 3d at 465 ("warn[ing] that any further attempts to unlawfully fill the office will result in dismissals of pending cases"); Defs.' Renewed Mot. to Dismiss and to Disqualify, No. 5:25-cr-00264, *United States v. Ramirez* (C.D. Cal. Sept. 4, 2026), Dkt. No. 68—in some districts leading to dismissal of indictments and quashing of grand jury subpoenas, *James*, 810 F. Supp. 3d at 763-68; *Comey*, 810 F. Supp. 3d at 781-87; *Grand Jury Subpoenas*, 814 F. Supp. 3d at 299-300. And confusion over who heads an office impairs the orderly administration of justice and the public's trust in the judicial system.

**D. Proceedings Below.**

Rogoff filed a complaint and a motion for a preliminary injunction on July 21, 2026. ER-26; SER-48. After briefing on Rogoff's motion for a preliminary

injunction had concluded, and three days before the district court heard argument, Defendants sought judicial notice of two facts: "(1) on September 14, 2026, the President nominated Simon Peter Serrano to the position of United States Attorney for the Western District of Washington; and (2) on September 25, 2026, the President signed a memorandum titled 'Memorandum for Charles Neil Floyd.'" ER-13; *see also Jackson*, 187 F.4th at 1203 (noting that the President submitted a nomination for the U.S. Attorney for the District of Nevada the day before this Court heard oral argument in that case). The memorandum, which is addressed to Floyd as "Immigration Judge, Department of Justice"—a title that he has not held since March 2025, SER-96—states, "Pursuant to the Constitution and the laws of the United States, including section 3345(a) of title 5, United States Code, you are directed to perform the functions and duties of the office of United States Attorney for the Western District of Washington." ER-21. The district court granted the request for judicial notice. ER-11.

On October 1, 2026, the district court held a hearing on Rogoff's motion for a preliminary injunction. Following argument, the district court granted Rogoff's motion. The court's order explained that Rogoff was likely to succeed on the merits because § 546(d) does not authorize the President to remove a court-appointed U.S. Attorney. ER-6. Reading §§ 541 and 546 together, the district court reasoned that § 541(c)'s removal provision applies only to U.S. Attorneys

appointed through the default process set out in § 541(a), while § 546(d) separately governs court appointments. ER-7-9. As the court determined, "[r]eading and applying §§ 541 and 546 to cover different scenarios is the only interpretation that maintains a coherent regulatory scheme." ER-9.

The district court explained that § 546(d) provides that a court-appointed U.S. Attorney serves "until 'the vacancy is filled,' which can only be done by the nomination/confirmation process." ER-8. Section 541(c), by contrast, allows the President to remove only "U.S. Attorneys in office by the nomination/confirmation process contemplated by § 541(a), not court-appointed U.S. Attorneys appointed pursuant to a separate statute, § 546(d)." ER-8. The district court emphasized that Defendants' contrary interpretation would "render meaningless the limits 28 U.S.C. § 546 imposes on the Executive's ability to circumvent the Senate's advice-and-consent framework." ER-8-9.

The district court also found that the remaining preliminary-injunction factors favored relief. Without an injunction, Rogoff would be deprived of his "statutory right to function as the U.S. Attorney for the Western District of Washington," and the U.S. Attorney's office would be left "with no lawfully appointed head, jeopardizing the functioning of the office." ER-10. The district court further concluded that Defendants would not be harmed by an injunction ending an unlawful practice and that allowing Rogoff's removal "would upend the

balance between the executive, judicial, and congressional branches of the government that is set out in the U.S. Constitution, as well as § 546." ER-10. Last, the district court held that the public "has an interest in the proper administration of justice." ER-10.

The court therefore enjoined Defendants the Executive Office of the President, Attorney General Blanche, and the Department of Justice, until the vacancy is filled through Senate confirmation, from effectuating Rogoff's removal, treating him as having been removed, obstructing his ability to access the position's benefits and resources or to perform its duties, or treating any other individual as the U.S. Attorney or chief federal law enforcement officer for the Western District of Washington. ER-11-12.

Floyd continues to hold himself out as the *de facto* head of the U.S. Attorney's office, and the Department of Justice's website continues to state that "First Assistant U.S. Attorney Charles Neil Floyd is the chief federal law enforcement officer in Western Washington."[1]

## SUMMARY OF THE ARGUMENT

Congress provided that, in the event that the President has exhausted the considerable statutory options available to him to appoint a U.S. Attorney to serve

[1] U.S. Att'y's Off., W.D. Wash., *About the District*, https://www.justice.gov/usao-wdwa (last visited Oct. 16, 2026).

on a temporary basis, the district court possesses the authority to "appoint a United States attorney to serve until the vacancy is filled." 28 U.S.C. § 546(d). Rogoff's purported firing violates both that statutory command and the Constitution's Appointments Clause. If allowed to stand, it will cause him and the public irreparable harm. Defendants, meanwhile, will suffer no harm from halting their unlawful actions. The district court was therefore correct to grant Rogoff preliminary injunctive relief, and this Court should affirm.

**I.A.** The Appointments Clause divides authority between the President and Congress, including by authorizing Congress to "vest the Appointment" of inferior officers, "as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Section 546(d), which authorizes the district court to appoint an interim U.S. Attorney under certain carefully delineated circumstances, is an exercise of that authority. As the statute's structure and history demonstrate, § 546(d) was crafted to protect the separation-of-powers principles embodied in the Appointments Clause by encouraging the President to appoint U.S. Attorneys through the default process: with Senate confirmation.

The text and structure of § 546(d) make clear that Rogoff must serve until a Senate-confirmed replacement assumes the office of U.S. Attorney. Section 546(d)—a modest stopgap measure that leaves the President with ample flexibility

and comes into play only as a last resort—shifts appointment authority to the district court "until the vacancy is filled." 28 U.S.C. § 546(d). To conclude otherwise would dismantle Congress's regime, which ensures that the work of the U.S. Attorney's office continues uninterrupted, preserves the President's role in selecting executive officials, and safeguards the values embedded in the Appointments Clause.

Defendants' contrary arguments are unavailing. Section 541(c), which grants the President authority to remove Senate-confirmed U.S. Attorneys, does not apply to court-appointed designees; if it did, § 546(d) would be rendered a nullity. Defendants' suggestion that § 546(d) requires courts to obtain the President's consent to a designee has no support in the statutory text, and it would leave no role for the Senate in the appointments process. No precedent supports Defendants' view, while recent Ninth Circuit authority is consistent with the district court's ruling. Defendants' purported concern about the risk of gross misconduct by a court-appointed U.S. Attorney ignores the multiple levers of control that the President (via the Attorney General) has over the conduct of the office. Nor can the President designate an Acting U.S. Attorney under the FVRA after the appointment power has already shifted to the district court.

**B.** Rogoff's firing also violates the Appointments Clause. The Clause expressly permits Congress to vest appointment of inferior officers in the courts,

and Congress exercised that authority in § 546(d). The President cannot negate Congress's choice. Further, if the President could fire a court-appointed U.S. Attorney without installing a Senate-confirmed replacement, and in doing so leave the office in the hands of his unilaterally chosen selectee, that result would subvert the Appointments Clause by allowing an official to serve as an officer of the United States without complying with constitutional requirements.

Section 546(d) does not intrude on the President's Article II prerogatives because "the President remains responsible for the exercise of executive power." *Arthrex*, 594 U.S. at 27. The President, acting through the Attorney General, possesses plenary authority over U.S. Attorneys, including § 546(d) designees. Section 546(d) only comes into play as a last resort, stopgap measure that the President can avoid altogether by submitting a confirmable nominee to the Senate. Even where a court designee is required, the President retains the power to remove that designee by obtaining Senate confirmation of a replacement. And because the President does not appoint a 546(d) designee in the first place, cases governing the President's power to remove those he appoints do not apply.

In choosing to vest appointment authority of certain U.S. Attorneys in the court, Congress exercised its authority to prevent "the evil of political executive removals" by regulating the removal of those same U.S. Attorneys. *Myers v. United States*, 272 U.S. 52, 162 (1926). That framework is entirely consistent with

the separation of powers, whereas Defendants' contentions would impermissibly allow the Take Care and Vesting Clauses to supplant the Appointments Clause.

**II.A.** Absent relief, Rogoff will suffer irreparable harm. The injunction protects Rogoff's statutory right to perform the duties of the office to which the district court appointed him. His removal, moreover, would leave the U.S. Attorney's office without a lawfully appointed head, generating uncertainty about its leadership and disrupting its work. The district court did not abuse its discretion in concluding that Rogoff would suffer an irreparable injury or that the harm to the office would exacerbate that injury.

**B.** Nor did the district court abuse its discretion in weighing the balance of equities and concluding that they favored Rogoff. By ensuring that the U.S. Attorney's office is led by a lawfully appointed official, the injunction serves the public interest in preserving the separation of powers and the orderly administration of justice. Defendants, on the other hand, have not demonstrated that they will suffer any harm. Their only claimed injury—that Rogoff's service will interfere with the President's executive authority—is neither correct on the merits nor sufficient to defeat the harms suffered by Rogoff and the public at large.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction "for abuse of discretion." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052

(9th Cir. 2009). Legal issues are reviewed de novo, but otherwise "review is limited and deferential." *Id.* (citation and internal quotation marks omitted).

## ARGUMENT

## I. ROGOFF IS LIKELY TO SUCCEED ON THE MERITS.

### A. Section 546(d) Precludes Rogoff's Firing.

#### 1. Section 546(d) Is Carefully Designed to Reinforce the Appointments Clause.

The Appointments Clause is "a critical structural safeguard of the constitutional scheme." *NLRB v. SW Gen.*, 580 U.S. 288, 293 (2017). Its default rule assigns to the President the power to nominate officers of the United States but at the same time requires the President to obtain the Senate's advice and consent before a nominee can take office. U.S. Const. art. II, § 2, cl. 2. By dividing control over appointments in this way, the Clause limits Executive power. It creates a bulwark against any "spirit of favoritism" that could incline a President to select "unfit characters" who possess "no other merit" aside from "being in some way or other personally allied to him." The Federalist No. 76, at 457-58 (A. Hamilton) (C. Rossiter ed., 1961).

With respect to inferior officers, the Appointments Clause imposes an additional separation-of-powers check on a President's ability to fill offices with persons of his choosing. The Clause authorizes Congress to "vest the Appointment" of such officers, "as they think proper, in the President alone, in the

Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. *See Arthrex*, 594 U.S. at 12. Thus, "any decision to dispense with Presidential appointment and Senate confirmation is Congress's to make, not the President's." *Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring); *see also Myers v. United States*, 272 U.S. 52, 293-94 (1926) (Brandeis, J., dissenting) (describing this aspect of the Clause as "[l]imiting further executive prerogatives customary in monarchies").

U.S. Attorneys are inferior officers. *United States v. Gantt*, 194 F.3d 987, 999 (9th Cir. 1999), *overruled in part on other grounds*, *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008). By law, they ordinarily are appointed by the President, with the advice and consent of the Senate, to a four-year term, serving until a replacement is confirmed. 28 U.S.C. § 541(a)-(b). But in recognition of the practical need to ensure that the responsibilities of the office can be discharged when no confirmed U.S. Attorney is in place, Congress has established alternative means by which the office of U.S. Attorney can be filled on a temporary basis. The first is the general power Congress conferred on the Executive to appoint acting officials, subject to the constraints of the FVRA. *See SW Gen.*, 580 U.S. at 292. The second is 28 U.S.C. § 546, a statute specific to U.S. Attorneys that allows the Attorney General to appoint an interim U.S. Attorney for a 120-day period (or until a replacement is confirmed, whichever comes earlier), 28 U.S.C.

§ 546(a), (c), and then—as relevant here—shifts the appointment power to the district court to choose an interim U.S. Attorney who will serve until the vacancy is filled by Senate confirmation of a President's nominee. *See Jackson*, 187 F.4th at 1205; *Gantt*, 194 F.3d at 1000.

The design of § 546 is at the core of this case. Crucially, the statute comes into play only as a last resort, and even then just as a stopgap. The President has any number of ways to avoid a court appointment. He can promptly nominate a confirmable candidate to fill a vacant U.S. Attorney position. He can also use the FVRA, which contains generous time limits, to install an acting official while the nomination is pending.[2] *See* 5 U.S.C. §§ 3346, 3349a(b). And he can rely on § 546(a) to install an interim U.S. Attorney for 120 days.

The statutory design respects the President's ability to choose whom to nominate for the U.S. Attorney position and ensures that the functions of the office

[2] The FVRA provides that the office's "first assistant . . . shall perform the functions and duties of the office" automatically. 5 U.S.C. § 3345(a)(1); *Jackson*, 187 F.4th at 1206-07. The FVRA also gives the President two alternatives to the default rule. The President may appoint as Acting U.S. Attorney someone who has been confirmed by the Senate for another office, or an officer or employee of the agency who meets certain statutorily prescribed seniority requirements. 5 U.S.C. § 3345(a)(2)-(3). Under the FVRA, any acting official may serve only up to 210 days (or for a longer term if the vacancy arose during a presidential transition period, *id.* § 3349a(b)), "beginning on the date the vacancy occurs" or, subject to certain requirements, while a first or second nomination to the office is pending, *id.* § 3346(a).

of U.S. Attorney can be carried out even absent a Senate-confirmed officer. But at the same time it creates a strong incentive for the President to respect the Senate's advice-and-consent power. Through the combined operation of the FVRA and § 541, the President is afforded upwards of a year (or even longer if a nomination is pending in the Senate) to rely on temporary officeholders while securing Senate confirmation of the President's choice for U.S. Attorney. But once that period runs out, the appointment power shifts to the district court, thereby curbing the President's ability to keep an unconfirmed official in place indefinitely. A contrary scheme—one that gave the President plenary power to determine who can serve indefinitely as an interim U.S. Attorney—would extinguish any need for the President to follow the constitutionally prescribed appointments process, and subvert the separation-of-powers principles that animate the process. *See Jackson*, 187 F.4th at 1205 ("[T]he 120-day time limit of section 546(c)(2) ensures that the Senate retains its role in the appointment process despite the occasional designation of temporary officers.").

The statutory history confirms that Congress vested this interim appointment power in the district court for the very purpose of checking executive abuse of the appointments process. Congress first gave the Judiciary the authority to appoint interim U.S. Attorneys to serve until a successor is nominated and confirmed in the 1860s. *See id.*; Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768, 768. But in 2006,

Congress eliminated the district court's role. Pub. L. No. 109-177, § 502, 120 Stat. 192, 246 (2006). At the same time, it removed the 120-day limit, allowing the Attorney General's designee to serve indefinitely. *See id.* Almost immediately, those amendments "invited and abetted an apparent abuse of power" by the Executive Branch that "threaten[ed] to undermine the effectiveness and professionalism of U.S. attorneys offices." 153 Cong. Rec. S1993 (2007). Congress responded by reverting to the prior version of the statute just one year later, returning the appointment power to the district court after 120 days. *See* Pub. L. No. 110-34, § 2, 121 Stat. 224 (2007).

### 2. Rogoff's Dismissal Violates the Statutory Framework Governing the Service of Interim U.S. Attorneys.

Defendants' dismissal of Rogoff violates § 546 and offends the separation-of-powers values it was enacted to protect. Text, structure, and precedent all establish that the President may not summarily dismiss a court-designated U.S. Attorney.

Section 546 states that if the Attorney General's appointment power expires, "the district court for such district may appoint a United States attorney to serve until the vacancy is filled." 28 U.S.C. § 546(d). The text thus dictates both the scope of the district court's power (to determine who "serve[s]" as interim U.S. Attorney) and its duration ("until the vacancy is filled"). In other words, § 546(d)

specifies that the district court decides who occupies that office until a replacement is "appointed by the President and confirmed by the Senate." *Gantt*, 194 F.3d at 1000.

As the district court correctly held, that language necessarily prevents the President from removing a court-designated U.S. Attorney by any means other than obtaining Senate confirmation of a successor. ER-8. It should be obvious that a district court does not have the power to select who "serves" if the President or the Attorney General can summarily remove that official. Indeed, interpreting § 546(d) to allow the President to terminate a court's appointee without obtaining Senate confirmation for a replacement would read the phrase "to serve until the vacancy is filled" out of the statute entirely. The district court would retain the power to appoint an interim U.S. Attorney, but (as the circumstances here vividly illustrate) that power would amount to nothing because the President could summarily terminate the appointee—meaning that the appointee would not "serve until the vacancy is filled." *See Carcieri v. Salazar*, 555 U.S. 379, 391 (2009) (courts "are obliged to give effect, if possible, to every word Congress used.") (citation omitted).

The structure of § 546 confirms what the text states. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home*

*Depot USA, Inc. v. Jackson*, 587 U.S. 435, 441 (2019) (citation omitted). Here, the power-shifting structure of the statutory scheme strikes a careful balance. As described above, *see supra* pp. 19-21, it respects the President's prerogatives to select a U.S. Attorney nominee for consideration by the Senate and also ensures "that the work of the U.S. Attorney's Office continues uninterrupted" until a nominee is confirmed. *Jackson*, 187 F.4th at 1205. But it does so in a manner that safeguards the values embedded in the Appointments Clause. Although the Executive initially enjoys discretion to install an interim U.S. Attorney, "the statutory plan discloses a Congressional purpose that after the expiration of the 120-day period further interim appointments are to be made by the court." *Jackson*, 187 F.4th at 1205 (quoting Memorandum from Samuel A. Alito, Jr., Deputy Assistant Att'y Gen., Off. of Legal Couns., to William P. Tyson, Dir., Exec. Off. for U.S. Att'ys 3 (Nov. 13, 1986)). That transfer of power encourages the President to reassert control over who holds the office by resorting to the usual channel of obtaining the Senate's consent to fill the vacancy. *See* 153 Cong. Rec. S1994 (2007) (explaining that the Judiciary's role in interim appointments incentivizes the Executive "to fill vacancies with Senate-confirmable nominees").[3]

[3] Defendants dispute that § 546(d) serves this incentivizing function, arguing that a court appointee will not "usually be intolerable to the President." Opening Br. 27. But that contention is belied by this very case, which seems to have finally spurred

That carefully balanced framework would fall apart if the President could summarily remove § 546(d) designees and leave headless offices run by his chosen *de facto* designees. As the district court noted, nothing would prevent the President from "circumvent[ing]," ER-9, his statutory and constitutional obligation to obtain Senate confirmation for his U.S. Attorney appointee, 28 U.S.C. § 541(a) ("The President *shall* appoint, by and with the advice and consent of the Senate, a United States Attorney for each judicial district." (emphasis added)); *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016) ("When vacancies arise, the president's duty is to submit nominees for offices to the Senate, not to fill those offices himself." (alteration and internal quotation marks omitted)). A President would never need to submit a nominee to the Senate. For that matter, he would never even need to use the FVRA. Such a regime would also undermine Congress's evident interest in ensuring that the work of U.S. Attorney's offices can continue, because it would leave headless offices across the country and expose their important work to the risk of legal challenges.

Indeed, § 546's power-shifting mechanism would make no sense under Defendants' reading. Congress intentionally limited the duration of an interim U.S. Attorney appointed by the Attorney General—after learning the hard way that

---

the President to nominate someone for the U.S. Attorney position, just days before the district court held argument. ER-17, 19.

the absence of a time limit was an invitation to abuse. *See supra* pp. 20-21. The resulting statute thus "does not contemplate a role for the President or the Attorney General after the expiration of the 120-day appointment." *Jackson*, 187 F.4th at 1205. And yet, on Defendants' view, even after the appointment power has shifted to the district court, the President can fire the court's designee at the drop of a hat and restore his preferred official to head the office indefinitely, rendering illusory the district court's statutorily conferred authority over who will serve as interim U.S. Attorney. Had Congress intended that result, it would have left the appointment power with the Attorney General in the first place.

Circuit precedent also supports the district court's reading of § 546. This Court has recognized that § 546(d) designees differ from Senate-confirmed U.S. Attorneys because they serve a "specially limited term." *Gantt*, 194 F.3d at 999 n.5. And it rejected a challenge to the constitutionality of § 546(d) in part because "the President retains the power to replace the court-appointed United States Attorney *with an Attorney appointed by the President and confirmed by the Senate*." *Id.* at 1000 (emphasis added). If the President had the power to remove court-appointed U.S. Attorneys without appointing a Senate-confirmed

replacement, the additional ability to remove him via that method would have been irrelevant.[4]

### 3. Defendants' Counterarguments Lack Merit.

***a. Section 541 does not apply.*** Rather than address the text and structure of § 546(d) directly, Defendants invoke a different statute—28 U.S.C. § 541(c)—which specifies that "[e]ach United States attorney is subject to removal by the President," to support their assertion that the President has unfettered authority to fire court-appointed U.S. Attorneys. Opening Br. 17-19. But while that statutory language "may seem plain when viewed in isolation, such a reading turns out to be untenable in light of the statute as a whole." *King v. Burwell*, 576 U.S. 473, 497 (2015) (citation omitted).

Section 541(c) governs the removal of *Senate-confirmed* U.S. Attorneys, not U.S. Attorneys appointed by a court under § 546(d). Section 541(c) is the last subsection of a statute, the first two subsections of which govern the appointment procedure and tenure for Senate-confirmed U.S. Attorneys. 28 U.S.C. § 541(a); *id.* § 541(b) (setting time limits distinct from those in § 546). It follows that § 541(c)'s at-will removal provision likewise applies to Senate-confirmed U.S.

---

[4] *Gantt* also upheld Congress's decision to vest the appointment of interim U.S. Attorneys in the district court. *See* 194 F.3d at 999. To the extent Defendants mean to suggest that Rogoff's appointment may not have been constitutionally valid, *see* Opening Br. 41-42, *Gantt* forecloses that argument.

Attorneys alone. *See Mansell v. Mansell*, 490 U.S. 581, 591-92 (1989) (finding it "unlikely that every subsection of" a statutory provision "except [one]" concerned a particular subject). Section 546 covers a different scenario; as its text and title make clear, it applies when the office is "vacant" of a Senate-confirmed U.S. Attorney. *See* 28 U.S.C. § 546(a), (c)(1), (d); *Dubin v. United States*, 599 U.S. 110, 120-21 (2023) (using the "title of a statute" as an interpretive tool (citation omitted)).

Additionally, as the district court recognized, "[r]eading and applying §§ 541 and 546 to cover different scenarios is the only interpretation that maintains a coherent regulatory scheme." ER-9; *see In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1214 (9th Cir. 2020) (citation omitted). Given the choice between a construction of two statutes that "fit[s] . . . all parts into an harmonious whole" and one that would "essentially nullify" one of the provisions, courts must choose the former. *Id.* (citation omitted). Here, that principle requires the conclusion that § 541(c)'s at-will removal provision applies only to Senate-confirmed U.S. Attorneys. A contrary conclusion would upend § 546(d) and leave it with little practical force. *See supra* pp. 22, 24-25.

Defendants never grapple with this critical point. Ignoring structure and context, they insist that "each" means "every one of the persons or things

mentioned" and that, because Rogoff would be a United States Attorney, he is one of the "persons . . . mentioned" in § 541(c). Opening Br. 18. But the "definition of [a] word[] in isolation" does not control a statute's construction. *Dolan v. USPS*, 546 U.S. 481, 486 (2006). And here, the broader context refutes Defendants' attempt to define § 546(d) by focusing myopically on the single word "each." Indeed, their argument is entirely circular. It assumes the conclusion to assert that § 541(c) "is the only provision governing removal of U.S. Attorneys." Opening Br. 23. The question here is whether § 546(d) is also a "provision governing removal of U.S. Attorneys" that operates independently of § 541(c).

The weight Defendants seek to place on the word "each" is also belied by the statutory text itself. Section 541(b), which immediately precedes § 541(c) in the same section, also uses the phrase "[e]ach United States Attorney." And § 541(b) indisputably does *not* apply to § 546(d) appointees. *See* SER-27.

Ignoring § 541(b), Defendants point to a separate statute (§ 547) that also uses the word "each" and applies to court-appointed U.S. Attorneys, Opening Br. 18, but there is no reason to presume that "each" in § 541(c) shares a definition with a different statute and not with the section that immediately precedes it. The principle that "a word or phrase is presumed to bear the same meaning throughout a text," *United States v. Paulson*, 68 F.4th 528, 555 (9th Cir. 2023) (citation omitted), therefore supports the district court's reading of the statute, not

Defendants'. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) (The "presumption that a given term is used to mean the same thing throughout a statute" is "surely at its most vigorous when a term is repeated within a given sentence.").

***b. Congress did not relinquish the Senate's role in appointments by enacting § 546(d).*** Defendants contend that recognizing unfettered presidential power to remove court-designated interim U.S. Attorneys does no violence to § 546(d) because it would simply "require[] courts to work with the Executive Branch to fill vacancies." Opening Br. 25-26. But adopting that interpretation would cut the Senate out of the appointments process entirely—leaving the decision of who can serve an indefinite term as interim U.S. Attorney to the President and the district court alone. Nothing in the text of § 546(d) suggests that Congress intended such a result, and any such suggestion is implausible. *See Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (absent a clear statement, courts will not read a statute to "relinquish" such a "core congressional power").

Defendants deny that their reading of § 546(d) would produce that result, insisting that collaboration between the President and the courts over whom to appoint would be a mere prelude to the President securing Senate confirmation "of a new U.S. Attorney." Opening Br. 26. But a President would have no reason to bother with Senate confirmation of a U.S. Attorney nominee *after* "arriv[ing] at a mutually agreeable appointee" through negotiation with a district court, *id.*,

because a U.S. Attorney appointed under § 546(d) can serve indefinitely. Defendants' interpretation of § 546 would thus turn that provision into a self-defeating nullity.

***c. Precedent does not support Defendants' position.*** The principal case on which Defendants rely, *Parsons v. United States*, 167 U.S. 324 (1897), is inapposite. *See* Opening Br. 21-22. *Parsons* establishes only that language prescribing a specified term generally does not override the presumption that the official who appointed the officeholder can remove that officeholder before the term expires. Because the *Parsons* Court considered an official who was appointed by the President, it appropriately concluded that the same official was removable by the President notwithstanding the statute's inclusion of a fixed term of service. 167 U.S. at 343. But *Parsons* says nothing about the President's ability to remove an officer appointed by the district court.

In any event, § 546(d) differs in crucial ways from the statute at issue in *Parsons*. There, the Supreme Court's decision hinged on the legislative history of the statute at issue, which concerned the tenure of district attorneys. The statute's predecessor had prohibited the President from removing the officials without Senate consent, but Congress repealed that provision. Given that history, the Court concluded that Congress must have intended to "concede to the president the power of removal." *Id.* The opposite is true here: the history of § 546(d) reflects

Congress's intent to reassert its role in the appointment of U.S. Attorneys and rein in the President's abuse of the appointment authority. *See supra* pp. 20-21.

To be sure, a few nonbinding decisions have suggested in passing that § 541(c) allows presidents to remove court-designated U.S. Attorneys, Opening Br. 19, but those decisions lack persuasive force. They all involved challenges by criminal defendants to the appointment of interim U.S. Attorneys, not to their *removal*; thus, the question of removal was not squarely at issue. *See, e.g.*, *United States v. Hilario*, 218 F.3d 19, 21-22, 27 (1st Cir. 2000); *United States v. Martinez*, 565 F. Supp. 2d 1270, 1271, 1275 (D.N.M. 2008); *Naviwala*, 825 F. Supp. 3d at 465, 474; *United States v. Solomon*, 216 F. Supp. 835, 843 (S.D.N.Y. 1963). Neither the parties nor the courts addressed executive attempts to remove a judicially appointed U.S. Attorney or engaged with the textual, structural, or constitutional arguments that are central to this case. *See United States v. Evans-Martinez*, 611 F.3d 635, 641 n.9 (9th Cir. 2010) ("[a]bsent analysis or explanation," a court's conclusion is "unpersuasive").

Even more to the point, this Court's precedents support the district court's reading of § 546(d). Just two months ago, in *Jackson*, this Court recognized that § 546(d) "does not contemplate a role for the President or the Attorney General after the expiration of the 120-day appointment." 187 F.4th at 1205. And in *Gantt*, this Court recognized that a § 546(d) designee serves "until a United States

Attorney nominated by the President is confirmed by the Senate" and that "the President retains the power to replace the court-appointed United States Attorney with an Attorney appointed by the President and confirmed by the Senate." 194 F.3d at 998, 1000.

***d. Defendants' doomsday scenarios will not come to pass.*** Defendants do not even acknowledge, much less make any serious effort to justify, the concrete here-and-now injuries to the separation of powers and to the sound administration of the criminal justice system that flow from their insistence that a President possesses uncheckable power to fire U.S. Attorneys appointed under § 546(d). Instead, they raise the specter of a grossly malfeasant court-appointed U.S. Attorney whom "no one in the Executive Branch, or anywhere else, can remove . . . for any reason" under the district court's interpretation of § 546(d). Opening Br. 14. But Defendants are wrong in every particular.

First, if an interim U.S. Attorney were to engage in such misconduct, that person could be removed. Nothing in § 546(d)'s conferral of the appointment power upon the district court indicates that Congress intended to withhold the removal power that is traditionally "incident to the power of appointment." *Carlucci v. Doe*, 488 U.S. 93, 93 (1988); *see also In re Hennen*, 38 U.S. (13 Pet.) 230, 260 (1839) ("all inferior officers appointed" under Congress's vesting of the appointment authority in the President, the courts, or department heads "must hold

their office at the discretion of the appointing power").[5] Thus, in the unlikely event of the kind of misbehavior Defendants hypothesize, the district court can remove and replace an interim U.S. Attorney appointed under § 546(d).

Second, the Attorney General retains complete authority over the actions of any interim U.S. Attorney and can therefore countermand any action taken by an interim officeholder or even take over all of the responsibilities of that interim officeholder. *See infra* pp. 41-46.

Third, if a court-appointed interim U.S. Attorney were to abuse the powers of the office, there is every reason to think that the President and the Senate would move quickly to replace that person with a confirmed nominee. It beggars belief that, as Defendants suggest, the Senate would feel "no obligation to confirm a new U.S. Attorney" if Rogoff were to "vindictively prosecut[e] a neighbor, pursu[e] prosecutions regardless of any demonstrated legal or factual basis, or refus[e] to prosecute child-pornography or immigration-related crimes." Opening Br. at 24.

For these reasons, there is no merit to Defendants' hyperbolic assertion that the district court's retention of the removal authority traditionally incident to the

[5] Defendants suggest that *Morrison* demonstrates that court appointments must be subject to executive removal, but that case concerned a statute that explicitly transferred removal power from the appointing court to the Attorney General. *Morrison v. Olson*, 487 U.S. 654, 695-96 (1988). It does not support the broader proposition Defendants need.

appointment power would "make the court itself the chief federal prosecutor" for the Western District of Washington. *See* Opening Br. 43-44.

In sum, the exceedingly low hypothetical risk that any such situation would arise (and the ease with which it could be remedied) is no reason to ignore the existing concrete threat to the constitutional order posed by Defendants' assertion of unfettered presidential power to remove court-appointed U.S. Attorneys.

***e. The President's recent purported FVRA designation has no effect.***

Finally, if Defendants suggest that Floyd's purported designation as Acting U.S. Attorney makes a difference to this case, Opening Br. 27, that is not correct. Once a district court makes a § 546(d) appointment, the President has no authority to supplant that appointee by designating an Acting U.S. Attorney via the FVRA. The grant of authority to the district court in § 546(d), which is specific to the context of interim U.S. Attorney designations, displaces the President's more general power to designate acting executive officials pursuant to the FVRA. *See RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (citation omitted)).[6]

[6] In all events, it is far from clear that Floyd could be properly appointed under the FVRA. Defendants assert on appeal (and nowhere before) that the designation was made under 5 U.S.C. § 3345(a)(3). Opening Br. 9. But they offer no argument that Floyd satisfies the requirements of that provision. And the letter purporting to

### B. Rogoff's Firing Violates the Appointments Clause and Is Not Justified by Article II.

Permitting Rogoff's removal by the President would negate Congress's exercise of its Appointments Clause power to determine how and by whom inferior officers are appointed, effectively nullifying Congress' constitutional authority to vest appointments in the courts. It would also pave the way for a President to select *de facto* U.S. Attorneys to serve indefinitely in violation of the Appointments Clause's requirement of Senate advice and consent. Contrary to Defendants' protestations, neither the Constitution nor Supreme Court precedent requires that the President enjoy unfettered authority to remove a § 546(d) designee. *See United States v. Woodley*, 751 F.2d 1008, 1009-10 (9th Cir. 1985) (referencing the Supreme Court's "unequivocal[] state[ment]" that "[t]he Constitution . . . must be regarded as one instrument, all of whose provisions are to be deemed of equal validity" (third alteration in original) (citation omitted)).

#### 1. Rogoff's Firing Would Violate the Appointments Clause.

The Appointments Clause grants Congress the constitutional authority to specify the mode of appointing inferior officers, including U.S. Attorneys. *Gantt*, 194 F.3d at 999. It provides that Congress—and Congress alone—"may by Law

---

designate Floyd under the FVRA was addressed to him in his capacity as an "Immigration Judge," ER-21, a position he has not held since March 2025, SER-96.

vest the Appointment of . . . inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Congress has exercised that authority to determine how the office of U.S. Attorney will be filled. In the regular course, U.S. Attorneys must be appointed by the default method of presidential nomination and Senate confirmation. 28 U.S.C. § 541(a). But in the event of a vacancy, the Attorney General may temporarily designate an interim officeholder to serve for the shorter of 120 days or confirmation of a nominee to the post. *Id.* § 546(a), (c). And after expiration of the Attorney General's appointee's service, "*the district court* . . . may appoint a United States attorney to serve until the vacancy is filled." *Id.* § 546(d) (emphasis added). Here, the district court exercised that congressionally conferred power when it decided Rogoff was the right person to serve as U.S. Attorney until the President nominates and the Senate confirms a permanent U.S. Attorney for the Western District of Washington.

By immediately firing Rogoff—consistent with the Executive's practice of firing any district court appointee lacking "the support of POTUS," SER-150—and installing a *de facto* replacement, the President seeks to negate Congress's exercise of its constitutionally granted power. Section 546(d) vests the appointment of interim U.S. Attorneys, in circumstances like these, in a "Court[] of Law," *not* "in the President alone." U.S. Const. art. II, § 2, cl. 2. The President cannot arrogate

to himself the authority to make those interim appointments any more than he can rewrite § 546(d) to require presidential approval of the district court's choice. In purporting to remove Rogoff, the President has attempted to do both.[7]

Defendants' insistence that § 546(d) contemplates an appointment power for the district court contingent on "interbranch coordination" to secure Executive approval, Opening Br. 25-26, cannot possibly be squared with the text and function of the Appointments Clause. The Clause contemplates a specific method of coordination: presidential nomination and Senate confirmation. Defendants envision something altogether different: a constitutional principle that prevents Congress from vesting the appointment of executive officials in the Judiciary unless the President consents to the nominee. That proposition is nowhere to be found in the Appointments Clause, which authorizes Congress to vest appointments "in the Courts of Law" alone, with no requirement that the court obtain the "Advice and Consent" of any other Branch. U.S. Const. art. II, § 2, cl. 2.

[7] After a court-appointed U.S. Attorney was fired in another district, then-Deputy Attorney General Blanche explained the firing's motivation: "Judges don't pick U.S. Attorneys, @POTUS does." SER-144. That explanation directly conflicts with Congress's exercise of its constitutional authority to vest the appointment of inferior officers. Although Defendants' stated rationale appears to have evolved, *see* SER-169, their conduct has remained unchanged, *see supra* pp. 6-9.

This is no small matter. The Appointments Clause "is more than a matter of etiquette or protocol." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 760 (2025) (internal quotation marks and citation omitted). The collaboration it requires between the Executive and Congress "is a critical structural safeguard of the constitutional scheme." *SW Gen.*, 580 U.S. at 293 (citation and internal quotation marks omitted). By requiring the Senate's assent to the appointment of Executive officers and authorizing Congress to vest the appointment of inferior officers in the courts, the Clause imposes obvious and direct limits on the President's power to staff the Executive with officers he wants to assist him in execution of the laws. It does so, as Alexander Hamilton explained, to safeguard against any "spirit of favoritism" that could incline the President to select "unfit characters" who possess "no other merit" aside from "being in some way or other personally allied to him" and therefore would be more likely to do his bidding in derogation of the Constitution and laws. The Federalist No. 76, at 457-58 (A. Hamilton) (C. Rossiter ed., 1961); *see SW Gen.*, 580 U.S. at 293. Congress chose to exercise its Appointments Clause authority to vest the appointment of interim U.S. Attorneys first in the Attorney General and then in the courts until a replacement is confirmed by the Senate. As explained above, that choice ensures that the office can be filled temporarily while protecting the Senate's role in

confirming a long-term appointee through the normal process. *See supra* pp. 19-21.

Interpreting § 546(d) to allow the President to fire a court-appointed U.S. Attorney without securing Senate confirmation of a successor would abrogate Congress's Appointments Clause power in a second way, too. As the facts of this case show, if the President had that power, he could simply fire every designee the district court puts forth and leave the office permanently in the hands of his chosen first assistant. Under that regime, an effective office head who has not been confirmed by the Senate (or otherwise appointed consistent with the Appointments Clause) would end up carrying out all the duties of a U.S. Attorney. That would create a serious constitutional difficulty by allowing an official to "exercise[] significant authority pursuant to the laws of the United States"—i.e., to serve as an officer—without complying with the Clause's requirements. *See Lucia v. SEC*, 585 U.S. 237, 244-45 (2018) (citation omitted). In that way, too, Defendants' reading badly undermines one of the most "significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997).

### 2. Restricting the Executive's Ability to Fire Interim U.S. Attorneys Does Not Intrude on Presidential Prerogatives.

Whereas Defendants' interpretation of § 546(d) would impinge on Congress's Appointments Clause authority, the district court's interpretation of § 546(d) does not impermissibly intrude on the President's Article II authority.

The text of the Appointments Clause itself establishes that it is not an impermissible intrusion on the President's Article II executive power for Congress to vest the power to appoint an inferior officer in the federal courts. The text could hardly be clearer in conferring that constitutional authority on Congress. And because the power to remove is presumptively an incident of the power to appoint, *see supra* p. 32-33, it likewise does not automatically offend Article II to deny the President the power to remove a court-appointed inferior officer and vest that power exclusively in the court that appointed the officer in the first place. *See Hennen*, 38 U.S. (13 Pet.) at 261 (explaining that the power to remove, being "incident to the power of appointment," rests with the appointing authority absent an express statement by Congress to the contrary).

The relevant constitutional question, therefore, is whether Congress's choice to vest the power to appoint (and thus to remove) interim U.S. Attorneys in the courts in § 546(d) impermissibly intrudes on the President's Article II authority to supervise and control the exercise of executive power by court-appointed interim

U.S. Attorneys. Defendants insist that Article II demands that the President retain the unfettered power to remove in all circumstances, pointing to *Trump v. Slaughter*, 609 U.S. 422 (2026); *Seila Law*, 591 U.S. 197; *Free Enterprise Fund*, 561 U.S. 477; and *Myers*, 272 U.S. 52. But those cases are not controlling. All of them involved statutory limits on a President's ability to remove an Executive official appointed by the President himself. None involved a situation like this one, in which Congress conferred the appointment power on the courts. So the question here is whether the statutory framework governing U.S. Attorneys affords the President sufficient control over and responsibility for the exercise of executive power by interim U.S. Attorneys appointed under § 546(d) despite the President's lack of removal power. The answer to that question is a resounding yes.

***Presidential control.*** Section 546(d) leaves the President with full control over a court-designated U.S. Attorney. The President, acting through the Attorney General, has "plenary authority" over U.S. Attorneys, including those designated by the court under § 546(d). *Gantt*, 194 F.3d at 999. The Attorney General may "conduct any kind of legal proceeding, civil or criminal . . . which United States Attorneys are authorized by law to conduct." 28 U.S.C. § 515(a). He may "direct[]" "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested." *Id.* § 516. "[H]e may personally conduct and argue any case in a court of the United States in which the United

States is interested," *id.* § 518(b), or "specifically direct[]" a particular subordinate to conduct that proceeding herself, *id.* § 515(a). He "shall" also "supervise all litigation to which the United States . . . is a party, and shall direct all United States attorneys . . . in the discharge of their . . . duties." *Id.* § 519. In short, the Attorney General has undoubted statutory authority to control all litigation in which the United States is involved and may reassign or personally assert control over any and all of a U.S. Attorney's responsibilities. *Gantt*, 194 F.3d at 999. Those powers are virtually absolute. And that remains true even though Rogoff's workload would be substantial. *Contra* Opening Br. 44-45. Even if the Attorney General does not review every action Rogoff takes, "[w]hat matters is that [he] have the discretion" to do so. *Arthrex*, 594 U.S. at 27.[8]

To be sure, even given the Attorney General's supervisory authority, there is a possibility that a court-designated U.S. Attorney could go rogue and take some "irreversible" action, such as "terminating a trial after jeopardy has attached." Opening Br. 45. But that would be true even if the President could fire the interim U.S. Attorney at will—the dismissal would not undo an action taken before the

[8] Rogoff does not understand the district court's injunction against "obstruct[ing]" him "from accessing any of the benefits or resources of his position as U.S. Attorney" or "his ability to carry out the duties of the U.S. Attorney," ER-12, to in any way limit the Attorney General from exercising these statutory powers over him as U.S. Attorney.

U.S. Attorney was dismissed. And while the threat of presidential removal theoretically deters that sort of freelancing, the power to supervise here is just as fearsome as the power to remove. *See Arthrex*, 594 U.S. at 26-28. The Attorney General, who is under the direct control of the President, can assume the interim U.S. Attorney's caseload or reassign his responsibilities. *See supra* p. 41-42. The threat of an Attorney General exercising that authority is more than sufficient to keep interim U.S. Attorneys accountable.

Indeed, in other cases involving impermissibly appointed acting U.S. Attorneys, Defendants have gone out of their way to stress just how robust the Executive Branch's control over a U.S. Attorney is. In the petition for certiorari in *United States v. Jackson*, No. 26-304 (filed Sept. 8, 2026) ("*Jackson* Pet."), for example, Defendants emphasized that each U.S. Attorney is wholly subordinate to the Attorney General. Although each U.S. Attorney was originally "a king in his own domain," Defendants explain that Congress ultimately consolidated power in the Department of Justice. *Jackson* Pet. 6. Today, the Attorney General is "the head" of the Department and personally vested with "all functions of agencies and employes of" the Department of Justice. *Id.* at 7-8. And because that is so, Defendants continue, the Attorney General has the ability to sideline any given U.S. Attorney. To illustrate the point, Defendants contend that, even if the Office of the U.S. Attorney for the District of Nevada had not been vacant, the Attorney

General "could have directed all Assistant U.S. Attorneys to report to [the Office's] First Assistant and to disregard any contrary views of the U.S. Attorney." *Id.* at 28. Right or wrong, that submission makes Defendants' position clear: there is essentially no limit on the Executive's ability to supervise and control U.S. Attorneys' exercise of prosecutorial power.

Defendants nevertheless protest that the "Supreme Court has consistently rejected arguments that lesser supervisory measures render the President's removal power unnecessary." Opening Br. 44 (citing *Free Enter. Fund*, 561 U.S. at 504, and *Seila Law*, 591 U.S. at 231). But those cases did not evaluate an official subject to anything close to the level of supervision at issue here and are thus distinguishable. Where the Court has struck down removal restrictions on inferior officers, those officers had become rival power centers within the Executive Branch, staffed by officers who exercised significant authority but did not answer in any meaningful way to the President. In *Free Enterprise Fund*, for instance, the Court noted that the officers at issue were not "subject to the President's direct control," 561 U.S. at 495, because, although the government pointed out that the SEC as supervising entity retained "[b]road power over [the officer's] functions," the SEC did not have statutory "power to start, stop, or alter individual . . . investigations," and the control it did have (rewriting the officers' rules and taking over some of their functions) was not a practical means of

supervising individual Board members, *id.* at 504. The supervisory authority thus was not "plenary," and the President had insufficient tools to "micromanag[e] the Board's affairs." *Id.* And in *Seila Law*, the Court addressed a removal restriction for a *principal* officer. 591 U.S. at 238.

To be sure, the power of removal can be a means of controlling an executive officer and thus ensuring that the President is held accountable for the conduct of his officers. But it is well established that control need not be direct. The President does not have the direct authority to remove an inferior officer who has been appointed by the head of a department; only the department head does. That is considered sufficient control over the inferior officer because the President has the authority to remove the department head. By the same token, *Slaughter* did not purport to hold that presidents have unfettered Article II authority to remove any inferior officer for any reason. Although *Slaughter* held that removal restrictions in "expert agencies led by a group of principal officers" were unconstitutional, *Seila Law*, 591 U.S. at 204 (emphasis omitted), Defendants recognize that, even after *Slaughter*, the rule that Congress may "provide tenure protections to certain inferior officers," *id.* (emphasis omitted), "remains good law," Opening Br. 47; *see Slaughter*, 609 U.S. at 456 ("Nor do we determine the fate of officials not before

us.").[9] The question is always whether the President retains sufficient control over an inferior officer—be it direct or indirect—to ensure that the law is executed in conformity with the President's wishes. Here, as demonstrated above, the President plainly has such control.

Defendants nevertheless contend that, because a U.S. Attorney exercises more "significant policymaking and administrative authority" than the officials at issue in *United States v. Perkins* and *Morrison v. Olson*, § 546(d) falls outside the exception that *Slaughter* left intact. Opening Br. 47. But while an official's "lack[] [of] policymaking or significant administrative authority" can contribute to the conclusion that a removal restriction is acceptable, *Morrison*, 487 U.S. at 691, the nature of the official's authority alone is not determinative. In any "separation-of-powers inquiry" about potential encroachment on the President's powers, the relevant yardstick is the "extent to which [a provision of law] prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Mistretta*, 488 U.S. at 383 (citation omitted; alteration in original). Given that a § 546(d) designee is subject to far more extensive control than other inferior

[9] The day after handing down *Slaughter*, the Supreme Court denied the government's request to stay a decision enjoining the removal of an inferior officer—another indication that the inferior-officer exception was not at issue in *Slaughter*. *See Blanche v. Perlmutter*, 146 S. Ct. 2812 (2026).

officers the Court has considered, it is clear that § 546(d) falls well within the constitutional limits the Supreme Court has demarcated.

***b. Limited tenure.*** Defendants' argument also overlooks the unique features of § 546(d) that ensure that the provision imposes, at most, a minimal burden on the President's ability to dictate who wields executive power. To start, as explained at the outset, *see supra* p. 19, the provision comes into play only as a last resort. The President can temporarily fill the vacancy for nearly a year without involving the court—indeed, over a year if the vacancy arises during a presidential transition, and even longer if he submits any nominee to the Senate. *See* 5 U.S.C. §§ 3346, 3349a(b); 28 U.S.C. § 546(a), (c). If he submits a *confirmable* nominee to the Senate during that generous window, he can avoid the need for a court-appointed designee altogether.

Even in the narrow circumstances where the interim appointment power shifts to the district court, the President retains the power to replace the court's designee. After the court designates an interim U.S. Attorney, the President can remove the court's designee by "fill[ing]" the vacancy with a Senate-confirmed U.S. Attorney. 28 U.S.C. § 546(d); *see Gantt*, 194 F.3d at 1000; *supra* pp. 18-19. By empowering the President to "displace" the court-appointed U.S. Attorney through "the appointment of [an]other[]," § 546(d) provides a clear path to

removing the officeholder. *Blake v. United States*, 103 U.S. 227, 237 (1880); *see Keyes v. United States*, 109 U.S. 336, 339 (1883).

In fact, § 546(d) is less robust than other removal protections the Supreme Court has upheld. In *Perkins*, the Court sustained a statute prohibiting removal of an inferior officer except in cases of "misconduct." 116 U.S. 483, 485 (1886). And the Court recently blessed a scheme in which certain inferior officers were protected "against removal except 'for such cause as will promote the efficiency of the service.'" *Arthrex*, 594 U.S. at 25-26 (quoting 5 U.S.C. § 7513(a)). Unlike those statutes, which imposed substantive limitations on *why* an officer can be removed, § 546(d) imposes merely a procedural limitation on *how* the President may go about removal.

Of course, § 546(d) is still a restriction; once the district court's power kicks in, the statute does not give the President free rein to act unilaterally. If he wishes to replace a § 546(d) designee, he must obtain the Senate's consent. That gives the Senate the opportunity to reject his choice for the job. *See* Opening Br. 24-25. But that dynamic mirrors the division of responsibility laid out in the Appointments Clause itself. And the purpose of that division of responsibility is to deny the President the ability to operate unilaterally. *See SW Gen.*, 580 U.S. at 293. The Senate's right to assert its constitutional prerogatives—to insist on having a say in who takes office—is central to the Clause's design. That § 546(d) enforces that

right and gives it real teeth is a salutary feature of the statutory scheme, not a constitutional defect. *See generally NLRB v. Noel Canning*, 573 U.S. 513, 522-24, 556-57 (2014) (holding that the President could not use the Recess Appointments Clause to evade Senate advice and consent).

***c. Court appointment.*** Finally, Defendants do not grapple with the reality that a § 546(d) designee is not appointed by the President, even though their own authority indicates that distinction is a salient one. In particular, *Myers*, the Supreme Court's landmark removal case, recognized that point. Although the Court held in *Myers* that "the President must be permitted to 'select those who . . . act for him' and 'remov[e] those for whom he cannot continue to be responsible,'" *Slaughter*, 609 U.S. at 431 (quoting *Myers*, 272 U.S. at 117) (alterations in original), it arrived at that holding in the context of Senate-confirmed officers only. In the process, the Court recognized that Congress has the power to prevent "the evil of political executive removals" when it has specified that "the office shall be filled by the appointment by some other authority than the President with the consent of the Senate." *Myers*, 272 U.S. at 162. As the Court explained in *Myers*, Congress may only "provide for the removal of [an inferior] officer" "on [the] condition" that "it shall vest the appointment in some one other than the President with the consent of the Senate." *Id*. Here, of course, Congress has vested a § 546(d) designee's appointment in the district court. None of Defendants' cases

address the Executive's removal authority in that context, and—as the district court correctly held—"it does not follow [that the President] has authority to remove executive officers that he has *not* appointed." ER-9.

As *Myers* explained, Congress may provide for the removal of an inferior officer if Congress vests appointment power in someone other than the President. It follows that recognizing an unfettered removal power here would subvert Congress's authority, expressly guaranteed in Article II, to vest appointments outside the Executive Branch. *See supra* pp. 35-39. *Myers* recognized that Congress's power to choose an alternative method of appointment for an inferior officer is inherently bound up with an authority to regulate the removal of that officer. And that makes perfect sense. If the President has limitless authority to fire an officer even when Congress assigns the officer's appointment to the district court, that renders the court's ability to determine who should hold the position (and Congress's preference that the court ought to be the entity to decide) a matter of the President's grace. That would nullify a power that the Constitution textually commits to Congress.

Nor does § 546(d) somehow "resurrect[] the Tenure of Office Act." Opening Br. 14. The district court's appointment authority—and accordingly, the removal power, *see supra* pp. 32-33—distinguish this case from *Myers* and *Bowsher v. Synar*, 478 U.S. 714 (1986). The only "veto" Congress may exercise

here, unlike in those cases, is of the appointment of a replacement via the Senate's constitutionally enshrined advice-and-consent role; Congress cannot do anything to block a judicial removal.

Unlike Defendants' proposed interpretation, this framework is entirely consistent with the separation of powers. Although the Constitution requires that the three branches remain independent, "it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Indeed, the Appointments Clause itself provides that the selection of officers of the United States is an interbranch undertaking. U.S. Const. art. II, § 2, cl. 2. Accordingly, time and again, the Supreme Court has allowed Congress to create schemes that "to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment." *Mistretta*, 488 U.S. at 382. Congress did exactly that here, with a statute designed for the narrow purpose of ensuring that the work of a U.S. Attorney's Office can continue in what should be an unusual circumstance: when the office is vacant and the President has exhausted his options for naming an acting official through the FVRA and § 546(a).

At the end of the day, nothing in the Opening Brief or the authority it invokes requires this Court to ignore these structural dynamics. This Court's separation-of-powers inquiry must weigh the "extent to which" § 546(d) prevents

the Executive Branch "from accomplishing its constitutionally assigned functions" against the "need to promote objectives within the constitutional authority of Congress." *Mistretta*, 488 U.S. at 383 & n.13 (citation omitted). And any effect the statute could have on presidential prerogatives must be considered in light of Congress's constitutional authority to control how inferior officers are appointed and to insist on the right to pass on the fitness of such officers. In short, § 546(d) is precisely the sort of congressionally approved, "carefully crafted system of checked and balanced power" that the Supreme Court has repeatedly blessed. *Mistretta*, 488 U.S. at 381.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ENTERING A PRELIMINARY INJUNCTION.

### A. Absent Relief, Rogoff Will Suffer Irreparable Harm.

The district court did not abuse its discretion in finding that Rogoff's unlawful "purported removal as U.S. Attorney will cause him irreparable harm absent injunctive relief." ER-10; *see Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510 (9th Cir. 1994) ("The district court's finding on the likelihood of irreparable harm is reviewed for abuse of discretion.").

The Supreme Court has recognized that there are "genuinely extraordinary situation[s]" in which loss of government employment can constitute irreparable harm, even for "probationary employees." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). Indeed, the district court was far from alone in concluding that the

unlawful removal of a senior government official and the deprivation of that official's "statutory right to function" present an extraordinary situation causing irreparable harm. ER-10; *see, e.g.*, *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983); *Cook v. Trump*, 804 F. Supp. 3d 14, 39-43 (D.D.C. 2025) (collecting cases), *application for stay denied*, 609 U.S. 528 (2026).

Because of Defendants' actions, Rogoff has "lost the ability to fulfill a high-ranking, public-servant role" to which the Court appointed him. *Cook*, 804 F. Supp. 3d at 43 (citation omitted). In his court-appointed role, Rogoff is charged with all the duties of the U.S. Attorney, including prosecuting "all offenses against the United States" and prosecuting or defending "all civil actions" for the federal government. 28 U.S.C. § 547. Rogoff is thus a high-ranking official, and Defendants' attempted deprivation of his statutory right to function does not implicate merely the government's "internal affairs" or "contracts for personal service." *Sampson*, 415 U.S. at 83. The deprivation of Rogoff's right to perform these duties "itself constitutes irreparable harm." *Cook*, 804 F. Supp. 3d at 40.

The harm to the U.S. Attorney's office only reinforces Rogoff's showing of irreparable harm. *Berry*, 1983 WL 538, at *5. Courts assessing irreparable harm routinely "take into account the harm that the official's removal would have on the agency," *Cook*, 804 F. Supp. 3d at 40-41 (collecting cases)—even if the agency is not necessarily at risk of peril. The harm and disruption to an agency resulting

from a lawfully appointed official's removal *itself* represents an "additional layer of harm on top of [the official's] basic 'right to function'" that can put a case "squarely in the 'genuinely extraordinary situation.'" *Aviel v. Gor*, 780 F. Supp. 3d 1, 14 (D.D.C. 2025) (citation omitted).

Here, if allowed to stand, Rogoff's removal would leave the U.S. Attorney's office "with no lawfully appointed head," creating uncertainty surrounding the office's leadership and leaving its investigations and prosecutions subject to challenge—as Defendants' own actions confirm. ER-10. By purporting to appoint Floyd as "Acting U.S. Attorney" just days before the preliminary injunction hearing in this case, Defendants all but acknowledged that their maneuvers giving rise to this litigation required correction. But, as explained above, their latest attempt to unilaterally appoint an indefinite interim official—apparently based on his *past* position as an immigration judge—likewise violates the statutory scheme. *See supra* p. 34. Accordingly, absent injunctive relief, the harm to the U.S. Attorney's office will continue, placing this case in the "genuinely extraordinary situation."

### B. The Equities and Public Interest Strongly Favor Relief.

The balance of the equities and the public interest weigh in favor of an injunction. "Because '[a]n injunction is a matter of equitable discretion,' the 'assignment of weight to particular harms is a matter for district courts to decide.'"

*Thakur v. Trump*, 176 F.4th 1187, 1205 (9th Cir. 2026) (alteration in original) (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)). The district court properly concluded that the balance of equities and the public interest are "strongly in favor of granting a preliminary injunction," ER-10, and this Court should not reverse that exercise of discretion.

#### 1. The Public Has an Interest in Preserving the Separation of Powers and in the Administration of Justice.

The district court's injunction furthers the public interest in multiple important ways.

First, Rogoff's wrongful removal harms the separation of powers. *See supra* pp. 35-39. As the district court noted, "[f]ailure to grant the injunction would upend the balance between the executive, judicial, and congressional branches of the government that is set out in the U.S. Constitution, as well as § 546." ER-10; *see Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("[P]ublic interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").

Second, Rogoff's improper removal leaves this district with no lawfully appointed U.S. Attorney. *See supra* pp. 34, 38-39. The public has an interest "in ensuring that those purporting to wield the powers of a U.S. Attorney lawfully possess those powers." *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y*

*Gen.*, 2026 WL 686046, at *5 (N.D.N.Y. Mar. 11, 2026). Leaving the office with no lawful head endangers the fair and orderly administration of justice.

This public harm is concrete, as experiences in other districts make plain. *Supra* pp. 7-9. The exercise of federal prosecutorial power by someone without authority to do so, collateral challenges to the office's actions, and damage to public confidence in the integrity of the criminal process all injure the public interest. Leaving the U.S. Attorney's office without a lawfully appointed U.S. Attorney therefore jeopardizes the justice the office seeks on behalf of the United States for the people of this district. To be sure, the office continues to investigate and prosecute federal offenses and to carry on the work of federal law enforcement. But an unlawfully serving office head is subject to disqualification, as courts across the country have held—creating uncertainty as to the validity of any actions overseen by that individual. *See supra* pp. 8-9. The line attorneys "acting under the supervision" of an unlawful *de facto* U.S. Attorney may also be "subject to disqualification," and pending criminal cases are subject to dismissal. *Naviwala*, 825 F. Supp. 3d at 465, 531. Even if challenges to the office's actions are unsuccessful, defending against them poses a tremendous and unnecessary burden on the vital work of the office to enforce federal laws. This state of affairs undermines the public's trust in the office.

Defendants protest that the district court's injunction will create a "whipsaw in the management of the U.S. Attorney's office." Opening Br. 50. Changes in leadership of a government office are routine, and Congress designed § 546(d) to permit, and even promote, shifting leadership of a U.S. Attorney's office prior to Senate confirmation in the normal course. Such changes are thus no harm to the public. Indeed, elsewhere Congress has expressly provided that in certain circumstances a vacant office may *not* be led by a pending nominee, guaranteeing some shifts in leadership. 5 U.S.C. § 3345(b)(1)(A)(ii).

### 2. Defendants Will Not Suffer Harm as a Result of the Injunction.

On the other side of the ledger, Defendants' claim to the equities boils down to their contention that Rogoff's service as U.S. Attorney will "interfere[] with the President's ability to carry out Executive Branch policies." *Thakur*, 176 F.4th at 1205; *see* Opening Br. 48-50. That contention is wrong for all the reasons discussed above. *See supra* pp. 40-52. Rogoff, moreover, has "shown [he is] likely to succeed on the merits, and the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Id.* (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); ER-10.

The Supreme Court's interim orders in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), and *Trump v. Boyle*, 145 S. Ct. 2653 (2025), are not to the contrary.

Although the Court held in those cases that the equities favored the Executive rather than the allegedly wrongfully removed officers, the Court also cautioned that *Wilcox* should inform equitable discretion only in "like cases," and emphasized that *Boyle* did not differ from *Wilcox* "in any pertinent respect." *Boyle*, 145 S. Ct. at 2654.

Defendants conspicuously omit mention of *Trump v. Cook*, 609 U.S. 528 (2026), which confirms the limited scope of *Wilcox* and *Boyle*, as well as the broader principle that there is no one-size-fits-all approach to the equities in removal cases. In *Cook*, the Court denied the government's request to stay an order reinstating a Federal Reserve Governor, a decision that pivoted on the particular circumstances of that case. *Id.* at 529-30. Contrary to Defendants' insistence, then, the Supreme Court has never suggested that courts should mechanically conclude that the Executive has the better of the equities in every case involving a wrongful removal.

The framework at issue here was specifically designed to protect the Senate's role in officer appointments. Unlike *Wilcox* and *Boyle*, which concerned Senate-confirmed officials, this case concerns Congress's exercise of its constitutional authority to vest the appointment power in the court, as well as executive attempts to evade Senate advice and consent. The equities therefore differ in "pertinent respect[s]." *Boyle*, 145 S. Ct. at 2654.

Any harm to Defendants, moreover, would be self-inflicted. *Cf. Bennett v. Isagenix Int'l, Inc. LLC*, 118 F.4th 1120, 1129-30 (9th Cir. 2024). The President could end Rogoff's tenure by obtaining Senate confirmation for a replacement. Yet he did not nominate someone to the position until more than eight months after the Court announced its intention to appoint an interim official—and only on the eve of the district court's hearing on Rogoff's motion for a preliminary injunction.

Even if Defendants can establish that they may suffer some harm as a result of the district court's preliminary injunction, "that alone does not demonstrate that the district court abused its discretion in weighing the balance of equities and the public interest because Plaintiff[] also face[s] irreparable harms in the absence of injunctive relief." *Thakur*, 176 F.4th at 1205. It is for the district court to decide whether the equitable factors favor the entry of a preliminary injunction. This Court's review is limited to whether the lower court abused its discretion. It did not.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

DATED: October 16, 2026

Respectfully submitted,

By: */s/ Donald B. Verrilli Jr.*

Donald B. Verrilli Jr.
Esthena L. Barlow
Cynthia Y. Long
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

Hailyn J. Chen
Victoria A. Degtyareva
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave
50th Floor
Los Angeles, CA 90071
(213) 683-9100

Shannon Aminirad
Connor Hoge
MUNGER, TOLLES & OLSON LLP
560 Mission Street
27th Floor
San Francisco, CA 94105

Attorneys for Appellee Roger Rogoff

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,854 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14 point Times New Roman font.

DATED: October 16, 2026 MUNGER, TOLLES & OLSON LLP

By: *[/s/ Donald B. Verrilli Jr.]*

Donald B. Verrilli Jr.
Attorneys for Appellee Roger Rogoff

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2026, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the ACMS system, which sent notification of such filing to all registered users.

DATED: October 16, 2026

MUNGER, TOLLES & OLSON LLP

By: *_/s/ Donald B. Verrilli Jr._*

Donald B. Verrilli Jr.
Attorneys for Appellee Roger Rogoff

**ADDENDUM**

# TABLE OF CONTENTS

28 U.S.C. § 541 ........................................................................................ A1

28 U.S.C. § 546 ........................................................................................ A1

U.S. Const. art. II, § 2, cl. 2 ............................................................................ A1

**28 U.S.C. § 541 — United States attorneys**

**(a)** The President shall appoint, by and with the advice and consent of the Senate, a United States attorney for each judicial district.

**(b)** Each United States attorney shall be appointed for a term of four years. On the expiration of his term, a United States attorney shall continue to perform the duties of his office until his successor is appointed and qualifies.

**(c)** Each United States attorney is subject to removal by the President.

**28 U.S.C. § 546 — Vacancies**

**(a)** Except as provided in subsection (b), the Attorney General may appoint a United States attorney for the district in which the office of United States attorney is vacant.

**(b)** The Attorney General shall not appoint as United States attorney a person to whose appointment by the President to that office the Senate refused to give advice and consent.

**(c)** A person appointed as United States attorney under this section may serve until the earlier of—

> **(1)** the qualification of a United States attorney for such district appointed by the President under section 541 of this title; or
>
> **(2)** the expiration of 120 days after appointment by the Attorney General under this section.

**(d)** If an appointment expires under subsection (c)(2), the district court for such district may appoint a United States attorney to serve until the vacancy is filled. The order of appointment by the court shall be filed with the clerk of the court.

**U.S. Const. art. II, § 2, cl. 2**

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress

may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.